**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Howard Walton, | : | Case No. 1:11 CV 2739 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **MEMORANDUM OPINION** |
| Defendant, | : | **AND ORDER** |

### I. INTRODUCTION

Plaintiff Howard Walton ("Plaintiff") seeks judicial review, pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying his claim

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II

and XVI, respectively, of the Social Security Act, 42 U.S.C. §§§ 416(i), 423, and 1381 (Docket No. 1).

Pending are the parties' Briefs on the Merits (Docket Nos. 14 and 15). For the reasons that follow, the

Magistrate remands this case to the Commissioner for further review pursuant to the following

opinion.

1

## II. PROCEDURAL BACKGROUND

On April 28, 2009, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 10, pp. 176-87 of 429). On that same day, Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381 (Docket No. 10, pp. 176-87 of 429). In both applications, Plaintiff alleged a period of disability beginning April 5, 2008 (Docket No. 10, pp. 176-87 of 429). Plaintiff's claims were denied initially on August 18, 2009 (Docket No. 10, pp. 131-36 of 429), and upon reconsideration on January 6, 2010 (Docket No. 10, pp. 142-44 of 429). Plaintiff thereafter filed a timely written request for a hearing on January 27, 2010 (Docket No. 10, p. 142 of 429).

On April 28, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Hilton R. Miller ("ALJ Miller") (Docket No. 10, pp. 31-77 of 429).          Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 10, pp. 31-77 of 429). ALJ Miller found Plaintiff to have a severe combination of post-operative lumbar disease with lumbar spondylosis and bilateral shoulder tendinitis with an onset date of April 5, 2008 (Docket No. 10, p. 21 of 429). Despite these limitations, ALJ Miller determined, based on all the evidence presented, Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of his decision (Docket No. 10, p. 19 of 429). ALJ Miller found Plaintiff had the residual functional capacity to perform sedentary work with the exception of overhead reaching, climbing ramps, stairs, ropes, or scaffolds, being exposed to temperature extremes, and using unprotected heights (Docket No. 10, p. 22 of 429). Additionally, ALJ Miller found Plaintiff capable of performing his past relevant work as a machine operator as that occupation is generally performed

2

(Docket No. 10, p. 25 of 429). Plaintiff's request for benefits was therefore denied (Docket No. 10, p. 25 of 429).

On May 3, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of his denial of DIB and SSI (Docket No. 1). In his pleading, Plaintiff alleged: (1) the ALJ failed to properly apply the treating physician rule to the opinion of Plaintiff's treating physician; and (2) the ALJ erred in relying upon the VE's testimony, which was not elicited in response to a proper hypothetical and directly conflicted with the Dictionary of Occupational Titles ("DOT") (Docket No. 14, pp. 1-17 of 17). Defendant filed its Answer on March 13, 2012 (Docket No. 9). On that same date, the parties consented to the jurisdiction of the undersigned Magistrate for all further proceedings and the entry of judgment pursuant to 28 U.S.C. § 636(c) (Docket No. 12).

### III.  FACTUAL BACKGROUND

#### A.    THE ADMINISTRATIVE HEARING

An administrative hearing convened on April 28, 2011, in Akron, Ohio (Docket No. 10, p. 31 of 429). Plaintiff, represented by counsel Steven Stocker, appeared and testified (Docket No. 10, pp. 31-77 of 429). Also present (via telephone) and testifying was VE Mark A. Pinti ("Mr. Pinti") (Docket No. 10, pp. 31-77 of 429).

#### 1.    PLAINTIFF'S TESTIMONY

Plaintiff is a divorced father of two grown children and currently resides with his sister (Docket No. 10, pp. 39-40 of 429). Plaintiff is also a self-described functional alcoholic and was known, at one point, to consume approximately twelve to fifteen beers per day (Docket No. 10, p. 39 of 429). Plaintiff stated he had received five total DUI charges over his lifetime, resulting in either incarceration and/or rehabilitation (Docket No. 10, pp. 53-54 of 429). Plaintiff reported losing two

3

previous jobs as a result of his DUIs, but testified he had never been terminated due to drinking while on the job (Docket No. 10, pp. 58-59 of 429). At the time of the administrative hearing, Plaintiff claimed to have been sober since December 30, 2008 (Docket No. 10, p. 64 of 429), and reported he was able to quit drinking on his own and did not attend Alcoholics Anonymous meetings (Docket No. 10, pp. 58, 64 of 429). Plaintiff admitted to smoking at least one pack of cigarettes every day (Docket No. 10, p. 51 of 429).When asked, Plaintiff indicated he drives and had a current drivers license (Docket No. 10, pp. 60-61 of 429). Unemployed since July 2008, Plaintiff stated his only source of income was the $115 per month he receives from Job and Family Services (Docket No. 10, p. 60 of 429).

Plaintiff testified his most recent job was with Knott Brake Company ("Knott") as a machine operator (Docket No. 10, pp. 39-40 of 429), making ten dollars per hour, approximately $2,000 per month (Docket No. 10, p. 67 of 429). As a machine operator, Plaintiff ran a fully automatic CNC machine, which required him to load parts into a carousel which would then be cut by the machine (Docket No. 10, pp. 68-69 of 429). Plaintiff testified he was responsible for keeping the machine running by loading the parts, which weighed anywhere from five to ten pounds, on a continuous basis (Docket No. 10, pp. 69-70 of 429). Plaintiff stated he could load up to 300 parts per day (Docket No. 10, p. 70 of 429). Plaintiff could lift as many parts at a time as he chose, depending on how fast he wanted to complete his work (Docket No. 10, p. 70 of 429). He was also responsible for a minimal amount of paperwork (Docket No. 10, p. 72-73 of 429). According to Plaintiff, he was prohibited from sitting down on the job at any time, even to complete his paperwork (Docket No. 10, pp. 72-73 of 429).   Prior to his employment at Knott, Plaintiff worked for Yates Toles ("Yates") as a machine operator (Docket No. 10, pp. 40-41 of 429) and Viking Industries ("Viking") as a press operator

4

(Docket No. 10, p. 41 of 429). According to Plaintiff, he was terminated from Knott after receiving his fifth DUI and spending sixty-nine days in jail (Docket No. 10, p. 41 of 429). Once released, Plaintiff stated he attempted to look for work but, when his efforts proved unsuccessful, he simply opted to remain unemployed (Docket No. 10, pp. 39, 41-42 of 429). When asked, Plaintiff testified he did not believe his difficulty in finding or keeping a job had anything to do with his alcoholism (Docket No. 10, pp. 58-59 of 429).

Plaintiff testified in some detail as to his back, shoulder, and neck pain. According to Plaintiff, he had back surgery in the mid-1990s but continued to experience pain (Docket No. 10, p. 45 of 429). Plaintiff described his current back pain as constant "radiating pain," radiating in a circle around his whole lower back, sometimes shooting down his right leg and up his right arm (Docket No. 10, p. 45 of 429). Plaintiff testified the pain worsens if he does any lifting, moves too quickly, or over-exerts himself (Docket No. 10, pp. 45-46 of 429). He sometimes has difficulty standing or walking, allegedly only being able to walk one city block without stopping, and constantly has to readjust his body position (Docket No. 10, pp. 46-47 of 429). Plaintiff stated he can engage in everyday basic activities, such as going to the grocery store and household chores, but reported that he has to move around and change position every ten or fifteen minutes because of the pain (Docket No. 10, pp. 47-48, 52 of 429). Plaintiff stated he has difficulty bending over and lifting anything over five to ten pounds (Docket No. 10, pp. 48-49 of 429).

With regard to his shoulder, Plaintiff stated he has constant pain that worsens when he tries to move anything or lift his arm past shoulder-level (Docket No. 10, p. 50 of 429). With regard to his neck, Plaintiff testified he has a pinched nerve that is going through his spinal column (Docket No. 10, p. 61 of 429). Plaintiff stated he also has a bulging disc which prevents him from turning his head

5

(Docket No. 10, p. 63 of 429). Plaintiff further testified he had been having difficulty with dizziness and passing out, which doctors have allegedly attributed to his neck issues (Docket No. 10, pp. 61, 63 of 429). At the time of the hearing, Plaintiff was scheduled for additional diagnostic testing on his neck (Docket No. 10, pp. 61-62 of 429).

Plaintiff testified that he had been on and off pain medications over the years, when he had access to insurance (Docket No. 10, p. 56 of 429). In the four to five months before the established onset date of April 5, 2008, Plaintiff stated that he was not on any pain medications (Docket No. 10, p. 56 of 429). Plaintiff testified that, since mid-2009, he has been on ten milligrams of Percocet, four to five times per day, for his back pain (Docket No. 10, pp. 46, 57 of 429). He also takes anti-inflammatories (Docket No. 10, p. 46 of 429). With regard to additional surgery, Plaintiff testified that he was advised to undergo surgery (Docket No. 10, p. 57 of 429). However, when pressed by the ALJ a few moments later, Plaintiff admitted that, on March 24, 2011, his doctor advised him surgery was not necessary (Docket No. 10, p. 62 of 429).

According to Plaintiff, he first attempted to file for DIB and SSI in 1995 after his back surgery (Docket No. 10, pp. 54-55 of 429). Plaintiff testified he was told he was too young (Docket No. 10, pp. 54-55 of 429). Plaintiff admitted he was then able to work another ten to twelve years without issue, allegedly because he was self-medicating with alcohol (Docket No. 10, p. 55 of 429).

### 2. VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the hearing (Docket No. 10, p. 43 of 429), the VE described Plaintiff's past work as a machine operator as medium and semi-skilled, listed under DOT numbers 617.685-026 and 007.167-018 (Docket No. 10, pp. 43-44

6

of 429).[1] According to the VE, none of Plaintiff's previous jobs had transferable skills (Docket No. 10,

p. 44 of 429).

> ALJ Miller then posed the following hypothetical:

> Please consider a hypothetical individual of the Claimant's age, education and work experience and the residual functional capacity to perform the functional range of sedentary work that involves occasional overhead reaching; no climbing of ramps or stairs; no ladders, ropes or scaffolds; avoid temperature extremes and unprotected heights.

(Docket No. 10, p. 66 of 429). Based on Plaintiff's current age, education, and work experience, as

well as the additional limitations incorporated by the ALJ, Mr. Pinti testified Plaintiff could return to

his past work as a tool machine operator or regular controlled machine operator (Docket No. 10, p. 66

of 429). Mr. Pinti stated the job of machine operator is found under DOT number 007.167-018 (Docket

No. 10, p. 66 of 429). Mr. Pinti also indicated another name for machine operator is "CNC machine

operator" (Docket No. 10, p. 67 of 429). According to the expert, the job of machine operator is

classified as "sedentary," given its exertional requirements or limitations (Docket No. 10, p. 68 of

429).[2] Mr. Pinti later learned from Plaintiff's testimony that his former employer required him to stand

while operating the machine; Plaintiff was not allowed to sit (Docket No. 10, pp. 71-72 of 429). When

asked by the ALJ if this changed his opinion or testimony regarding whether Plaintiff could perform

---

[1] Plaintiff also worked as a food service worker in a hospital and as a general laborer at some point in his career. Mr. Pinti testified these jobs were both classified as medium and unskilled, found under DOT numbers 319.677-014 and 922.687-058, respectively (Docket No. 10, p. 44 of 429). Since neither of these positions accurately reflect Plaintiff's immediate past employment, they are discussed in limited detail both throughout the record and in this opinion.

[2] Sedentary work is defined as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

his past relevant work, Mr. Pinti answered in the negative, stating "just because the employer didn't allow there to be a stool doesn't mean that it could not have been done" (Docket No. 10, p. 73 of 429).

Plaintiff's counsel then added an additional limitation to the ALJ's hypothetical, asking Mr. Pinti whether it would change his opinion of Plaintiff's ability to return to his past relevant work if the hypothetical individual could only stand four out of the eight hours in a typical shift (Docket No. 10, p. 73 of 429). Mr. Pinti stated his opinion would only change "if the employer would . . . not allow the person to sit, even though they could do the job sitting" (Docket No. 10, p. 73 of 429). As the ALJ phrased it, and Mr. Pinti agreed, "the past relevant work could be performed as normally performed but, perhaps, maybe not as the Claimant performed it" (Docket No. 10, p. 74 of 429).

Plaintiff's counsel then added a second addition to the ALJ's original hypothetical, asking the VE if his opinion would change if the individual was limited to being able to only bend over occasionally (Docket No. 10, p. 76 of 429). Mr. Pinti stated that if the individual was bending frequently, he would change the classification of the workload from "sedentary" to "light" (Docket No. 10, p. 75 of 429).[3]

## B.    MEDICAL RECORDS

Plaintiff's medical records date back to April 12, 1995, when Plaintiff underwent a CT scan of his spine (Docket No. 10, p. 410 of 429). The scan revealed posterior spondylotic bulging, slight disc bulging, and a possible posterior central disc herniation (Docket No. 10, p. 410 of 429). Although

---

[3] Light work is defined as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

separate documentation is not contained in Plaintiff's medical records, it should be noted Plaintiff underwent back surgery, an L5 discectomy, in 1995 (Docket No. 10, p. 272 of 429). On July 23, 1999, it was noted Plaintiff had degenerative hypertrophic spur formation of his L2 and L3 vertebrae (Docket No. 10, p. 413 of 429).

Plaintiff began seeing his primary physician, Dr. Joseph Blackburn, M.D. ("Dr. Blackburn"), on May 2, 2000 (Docket No. 10, p. 276 of 429). During Plaintiff's first visit, and during his second follow up visit on May 30, 2000, Plaintiff never indicated he suffered from back, neck, or shoulder pain (Docket No. 10, p. 276 of 429).

Plaintiff's medical records then jump to November 20, 2002, when Plaintiff was seen in the Lodi Community Hospital Emergency Room presenting with increasing low back pain (Docket No. 10, p. 325 of 429). An examination revealed a moderate degenerative bone change, disc space narrowing at the L2 and L3 vertebrae, bilateral spurs on the L2 and L3 vertebrae, and irregularity of adjacent end plates on the L1 and L2 vertebrae (Docket No. 10, p. 325 of 429). Two days later, Plaintiff saw Dr. Blackburn as a follow up to this emergency room visit (Docket No. 10, p. 275 of 429). Dr. Blackburn made note of Plaintiff's chronic degenerative changes, but also reported Plaintiff had no acute tenderness, swelling, or radicular pain (Docket No. 10, p. 275 of 429). Plaintiff presented with normal gait and balance (Docket No. 10, p. 275 of 429). Dr. Blackburn prescribed Celebrex, Flexeril, and Vicodin and provided the name of a spine surgeon for follow up (Docket No. 10, p. 275 of 429).

On December 4, 2002, Plaintiff saw physical therapist Susan Lockner ("Ms. Lockner") at Rehabilitation Services in Medina, Ohio, for a physical therapy evaluation (Docket No. 10, p. 287 of 429). Ms. Lockner recommended Plaintiff engage in physical therapy two times per week for a total of

four weeks (Docket No. 10, p. 287 of 429).

On January 10, 2003, Plaintiff saw Dr. Blackburn again, still complaining of lower back pain (Docket No. 10, p. 275 of 429). Plaintiff presented with normal gait and balance, but had some difficulty with forward flexion and extension (Docket No. 10, p. 275 of 429). Plaintiff reported taking Vicodin every day and stated he had been told by a specialist that he was not a surgical candidate (Docket No. 10, p. 275 of 429). Dr. Blackburn discouraged Plaintiff's use of narcotics and ordered an MRI of his lower back (Docket No. 10, p. 275 of 429). Plaintiff underwent this MRI on January 28, 2003 (Docket No. 10, p. 283 of 429). Radiologist Dr. James S. Littman ("Dr. Littman") noted dehydration of discs at T-12, L1-L2, and L3-L4 (Docket No. 10, p. 283 of 429). Dr. Littman also noted mild annular bulging at the lowest level (Docket No. 10, p. 283 of 429). He found no focal disc bulge, disc herniation, canal stenosis, foraminal narrowing, or nerve root compressions (Docket No. 10, p. 283 of 429). Dr. Littman's impression stated Plaintiff suffered from "mild degenerative disc disease without herniation or canal stenosis" (Docket No. 10, p. 283 of 429).

On February 10, 2003, Plaintiff returned to Dr. Blackburn for his persistent back pain (Docket No. 10, p. 274 of 429). Plaintiff presented with normal gait and balance, but still suffered difficulty when bending forward (Docket No. 10, p. 274 of 429). Plaintiff reported having no radiating pain (Docket No. 10, p. 274 of 429). Dr. Blackburn prescribed Vicodin and Vioxx (Docket No. 10, p. 274 of 429). On February 27, 2003, Plaintiff was released from physical therapy on his own request (Docket No. 10, p. 324 of 429). Plaintiff saw Dr. Blackburn on October 9, 2003, still complaining of lower back pain (Docket No. 10, p. 274 of 429).

Plaintiff saw Dr. Blackburn again on March 22, 2004, for his lower back pain (Docket No. 10, p. 273 of 429). Dr. Blackburn noted Plaintiff's back was mildly tender to palpation (Docket No. 10, p.

10

273 of 429). On August 16, 2004, Plaintiff reported right shoulder pain in addition to his lower back pain (Docket No. 10, p. 273 of 429). Dr. Blackburn noted Plaintiff's back was mildly tender to palpation bilaterally and that his shoulder was tender at the acromioclavicular ("AC") joint but maintained a normal range of movement (Docket No. 10, p. 273 of 429).

According to his medical records, Plaintiff did not return to Dr. Blackburn for back or shoulder pain for more than a year after his August 2004 visit (Docket No. 10, p. 272 of 429). On November 18, 2005, Plaintiff reported continuing lower back and shoulder pain (Docket No. 10, p. 272 of 429). Dr. Blackburn reported Plaintiff's shoulder was tender to palpation in the AC joint, but maintained a normal range of movement (Docket No. 10, p. 272 of 429). He recommended physical therapy and suggested Plaintiff follow up with a spine surgeon for his lower back issues (Docket No. 10, p. 272 of 429).

On November 29, 2005, Plaintiff saw Dr. Andrew Scharf ("Dr. Scharf"), who conducted an MRI of Plaintiff's spine (Docket No. 10, p. 269 of 429). Dr. Scharf noted Plaintiff had multi-level degenerative changes but with no significant canal or foraminal stenosis (Docket No. 10, p. 269 of 429). He also reported seeing a mild disc bulge or protrusion in the L4-5 and L5-S1 vertebrae (Docket No. 10, p. 269 of 429).

According to the submitted medical records, Plaintiff did not return to Dr. Blackburn for nearly three years. On February 29, 2008, Plaintiff saw Dr. Blackburn and reported persistent lower back pain that was now radiating down his leg (Docket No. 10, p. 271 of 429). Dr. Blackburn prescribed Vicodin as well as Medrol and Naprosyn 500 (Docket No. 10, p. 271 of 429). After this visit, Plaintiff again went quite some time without seeing a physician about his lower back pain. On July 21, 2009, Plaintiff visited the Lodi Emergency Room complaining of neck pain he allegedly sustained in a car accident

11

two weeks prior (Docket No. 10, p. 350 of 429). The emergency room physician noted Plaintiff had a full range of neck motion as well as a normal gait (Docket No. 10, p. 350 of 429). Plaintiff's X-rays indicated some degenerative change (Docket No. 10, p. 350 of 429). The doctor diagnosed Plaintiff with a cervical strain and advised him to take 600 milligrams of ibuprofen three times per day for four to five days (Docket No. 10, p. 350 of 429).

On September 1, 2009, Plaintiff returned to the Lodi Emergency Room complaining of neck pain and lower back pain that was radiating down his right leg (Docket No. 10, p. 339 of 429). Plaintiff had a full range of neck motion and was not experiencing numbness, tingling, paresthesias, or weakness in his lower extremities (Docket No. 10, p. 339 of 429). Plaintiff was advised to take ibuprofen as needed (Docket No. 10, p. 340 of 429).

Plaintiff returned to Dr. Blackburn on January 5, 2010, at which time Dr. Blackburn issued Plaintiff a prescription ordering him to remain out of work until he underwent an MRI and could be evaluated by a spine surgeon (Docket No. 10, p. 342 of 429). On August 30, 2010, Plaintiff underwent an MRI of his spine (Docket No. 10, p. 364 of 429). A radiologist reported Plaintiff's mild degenerative disc disease, small lesions within the L2 and L5 vertebrae, an impending compression fracture, and abnormal bone marrow in the anterosuperior aspect of the L3 and the base of the L2 vertebrae (Docket No. 10, p. 364 of 429). The radiologist expressed some concern at seeing what he thought to be possible metastatic disease, given the small lesions on Plaintiff's vertebrae, and recommended a bone scan (Docket No. 10, p. 364 of 429).

On September 14, 2010, Plaintiff saw Dr. Blackburn and complained of lower back and shoulder pain as well as low grade dizzy spells (Docket No. 10, p. 356 of 429). Dr. Blackburn prescribed Percocet and Valium and also suggested Plaintiff arrange for a bone scan, as suggested by

12

the radiologist (Docket No. 10, p. 356 of 429). On September 16, 2010, Plaintiff underwent a full body bone scan at Medina Hospital (Docket No. 10, p. 362 of 429). The scan revealed Plaintiff had a mildly increased uptake at the sternoranubrial junction, minimal uptake at the margins of the left tibiofemoral joint, suggesting osteoarthritis, mildly increased uptake in his mid-lumbar spine, likely the L3 vertebrae, and periodontal disease (Docket No. 10, p. 362 of 429).

Plaintiff returned to Dr. Blackburn on November 8, 2010, after seeing a back specialist (Docket No. 10, p. 355 of 429). Plaintiff stated the specialist indicated Plaintiff was not a surgical candidate and should rather see a neurologist (Docket No. 10, p. 355 of 429). Dr. Blackburn referred Plaintiff to a neurologist and an orthopedist (Docket No. 10, p. 355 of 429). On November 15, 2010, Plaintiff underwent X-rays of his shoulder at Medina Hospital (Docket No. 10, p. 361 of 429). The X-rays revealed normal bony structures and no fracture, subluxation, or regional soft tissue calcification (Docket No. 10, p. 361 of 429).

On December 10, 2010, Plaintiff saw Dr. Eric Baron ("Dr. Baron"), a neurologist (Docket No. 10, p. 384 of 429). Dr. Baron found Plaintiff had no significant paraspinal neck or shoulder pain, no spinous process tenderness, had a stable primary gait, and a normal tandem gait (Docket No. 10, pp. 384-90 of 429). He ordered an MRI of Plaintiff's spine (Docket No. 10, p. 388 of 429).

Plaintiff saw Dr. Blackburn on January 4, 2011, and reported that he was going out of town for two months to care for his mother (Docket No. 10, p. 393 of 429). He still reported chronic lower back pain and a possible rotator cuff injury (Docket No. 10, p. 393 of 429). Dr. Blackburn gave Plaintiff a three-month prescription for Percocet (Docket No. 10, p. 393 of 429). On January 7, 2011, Plaintiff saw orthopedist Dr. Joseph Scarcella ("Dr. Scarcella") at the Cleveland Clinic (Docket No. 10, p. 397 of 429). Dr. Scarcella noted Plaintiff had full range of motion in both shoulders, but had marked

13

tenderness in the AC joint (Docket No. 10, p. 397 of 429). Dr. Scarcella also took an X-ray of Plaintiff's hypertrophic distal clavicle and found no significant arthritis (Docket No. 10, p. 397 of 429). The doctor recommended Plaintiff try a cortisone injection for his pain, which Plaintiff refused (Docket No. 10, p. 397 of 429). Dr. Scarcella also discussed the risks and benefits of surgery with Plaintiff, and Plaintiff indicated he wanted to proceed to surgery (Docket No. 10, p. 397 of 429).

On March 24, 2011, Plaintiff saw Dr. Adrian Zachary ("Dr. Zachary"), a spine doctor (Docket No. 10, p. 403 of 429). Plaintiff presented with cervical spine pain, lumbar spine pain, weakness in his right hand, numbness and tingling down his left arm, and reported episodes of passing out (Docket No. 10, p. 403 of 429). Plaintiff also reported never having spinal surgery, despite previous medical records indicating he had back surgery in 1995 (Docket No. 10, p. 404 of 429). Dr. Zachary found Plaintiff to have a normal gait and range of motion, no apparent weakness, deep palpation tenderness, reduced range of motion when bending, and poor sitting posture (Docket No. 10, p. 404 of 429). Dr. Zachary diagnosed Plaintiff with degenerative disc disease with bilateral foraminal narrowing at the C5-6 and C6-7 vertebrae with compression of existing nerve roots bilaterally (Docket No. 10, p. 404 of 429). The doctor also reported Plaintiff likely had cervical spondylosis, the probable cause of Plaintiff's neck pain (Docket No. 10, p. 404 of 429). Dr. Zachary stated Plaintiff did not need to have surgery, but recommended an epidural injection and physical therapy (Docket No. 10, p. 404-05 of 429).

## 2.  STATE AGENCY EVALUATIONS

On August 15, 2009, state agency physician Dr. Leslie Green ("Dr. Green") reviewed Plaintiff's record (Docket No. 10, p. 329 of 429). Dr. Green reported Plaintiff's condition was not severe (Docket No. 10, p. 329 of 429).

14

On January 4, 2010, during the reconsideration of Plaintiff's claim, state agency physician Dr. Diane Manos ("Dr. Manos") reviewed Plaintiff's record (Docket No. 10, p. 341 of 429). Dr. Manos noted Plaintiff claimed his conditions were worsening (Docket No. 10, p. 341 of 429). After reviewing the record, Dr. Manos determined the evidence presented in Plaintiff's Motion for Reconsideration supported an affirmation of the initial decision made by Dr. Green in August 2009 (Docket No. 10, p. 341 of 429).

### 3.    PLAINTIFF'S MEDICAL ASSESSMENT/ABILITY TO WORK EVALUATION

On January 6, 2011, Dr. Blackburn completed a residual functional capacity evaluation of Plaintiff (Docket No. 10, pp. 367-70 of 429). Dr. Blackburn indicated Plaintiff had the maximum ability to: (1) lift and carry less than ten pounds on an occasional basis;[4] (2) lift and carry less than ten pounds on a frequent basis;[5] (3) stand and walk, with normal breaks, approximately two hours during an eight-hour day; and (4) sit, with normal breaks, approximately two hours in an eight-hour day (Docket No. 10, p. 368 of 429). Dr. Blackburn also indicated Plaintiff could sit for fifteen minutes and stand for five minutes without changing position (Docket No. 10, p. 369 of 429). The doctor indicated Plaintiff must walk around every fifteen minutes for at least fifteen minutes and needed the opportunity to shift at will from sitting to standing/walking positions (Docket No. 10, p. 369 of 429). Dr. Blackburn indicated Plaintiff could twist, climb stairs or ladders occasionally, but never stoop (bend) or crouch (Docket No. 10, p. 370 of 429).

Dr. Blackburn reported Plaintiff had several physical functions affected by his impairment,

---

[4] Occasionally is defined as "from very little up to one-third of an eight hour day" (Docket No. 10, p. 370 of 429).

[5] Frequently is defined as "from one-third to two-thirds of an eight hour day" (Docket No. 10, p. 370 of 429).

15

including reaching (including overhead), handling (gross manipulation), fingering (fine manipulation), and pushing/pulling (Docket No. 10, p. 370 of 429). He suggested Plaintiff avoid concentrated exposure to extreme cold and extreme heat (Docket No. 10, p. 370 of 429). Dr. Blackburn stated he based his opinions on Plaintiff's "significant degenerative disc disease throughout [his] lumbar spine and overlying arthritis [as] seen on [an] MRI and bone scan" (Docket No. 10, p. 369 of 429). Dr. Blackburn also indicated Plaintiff was not a surgical candidate (Docket No. 10, p. 370 of 429).

## IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007). DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim. First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (*citing Abbott,* 905 F. 2d at 923). At the third step, a claimant is presumed to

16

be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, if other work exists in the national economy that he can perform, the claimant is not disabled. *Colvin*, 475 F.3d at 730 (*citin*g *Heston v. Comm'r of Soc. Sec*., 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

17

After careful consideration of the disability standards and the entire record, ALJ Miller made

the following findings:

1.  Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013.

2.  Plaintiff has not engaged in substantial gainful activity since April 5, 2008, the alleged onset date.

3.  Plaintiff has the following severe impairments: post-operative lumbar disease with lumbar spondylosis and bilateral shoulder tendinitis.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except that he can only engage in occasional overhead reaching, can never climb ramps, stairs, ladders, ropes or scaffolds, and should avoid temperature extremes and unprotected heights.

6.  Plaintiff is capable of performing his past relevant work as a Machine Operator, DOT 007.167-018. This work does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

7.  Plaintiff has not been under a disability, as defined in the Social Security Act, from April 5, 2008, through the date of this decision.

(Docket No. 10, pp. 19-25 of 429). ALJ Miller denied Plaintiff's request for DIB and SSI benefits

(Docket No. 10, p. 25 of 429).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-

33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's

conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact

that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27

18

(6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial

evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because

there exists in the record substantial evidence to support a different conclusion . . . This is so because

there is a 'zone of choice' within which the Commissioner can act, without the fear of court

interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.

2001) (citations omitted)).

## VII. DISCUSSION

### A.    PLAINTIFF'S ALLEGATIONS

In his Brief on the Merits, Plaintiff argues: (1) the ALJ failed to properly apply the treating

physician rule to the opinion of Dr. Blackburn; and (2) the ALJ erred in relying upon VE testimony

which was not elicited in response to a proper hypothetical and directly conflicted with the DOT

(Docket No. 14).

### B.    DEFENDANT'S RESPONSE

Defendant contends substantial evidence exists to support both the ALJ's assessment as to the

medical source opinions and Plaintiff's ability to perform his past relevant work (Docket No. 15).

### C.    DISCUSSION

#### 1.    THE TREATING PHYSICIAN RULE

The Sixth Circuit provided a detailed summary of the treating physician rule in *Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). According to the Court, the treating physician rule:

> requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).

> The ALJ must give a treating source opinion controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. On the other hand . . . it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *SSR* 96-2p, 1996 SSR LEXIS 9 at *5 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544.

> [T]he regulations require the ALJ to always give good reasons in the notice of determination or decision for the weight given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *SSR* 96-2p, 1996 SSR LEXIS 9 at *12.

*Blakley*, 581 F.3d at 406-07 (internal quotations omitted). Here, the ALJ favored, although just slightly, the opinion of consultative examine Dr. Paul Steurer ("Dr. Steurer") over the opinion of Dr. Blackburn, Plaintiff's treating physician (Docket No. 10, pp. 24-25 of 429). Although ALJ Miller properly stated the amount of weight he gave to Dr. Blackburn's opinion, he failed to adequately complete the rest of the required analysis.

Before according any weight to the opinions of a claimant's physicians, the ALJ must first

20

determine which physicians he will consider to be "treating sources." "A physician is a treating source if he has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant . . . with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation that is typical for the treated conditions." *Blakley*, 581 F.3d at 407 (*quoting* 20 C.F.R. § 404.1502) (internal quotations omitted)). Dr. Blackburn has been Plaintiff's primary physician since May 2, 2000 (Docket No. 10, p. 276 of 429). According to the record, Dr. Blackburn has seen Plaintiff approximately fourteen times over the course of the past twelve years, the most recent appointment being December 15, 2010 (Docket No. 10, pp. 276-357 of 429). Dr. Blackburn treated Plaintiff for panic attacks, insomnia, depression, and acid reflux, as well as Plaintiff's back, neck and shoulder pain (Docket No. 10, pp. 276-357 of 429). As such, Dr. Blackburn developed an extensive treatment relationship, spanning over at least ten years, with Plaintiff. Although never specifically identified as such by ALJ Miller, given Dr. Blackburn's history with Plaintiff, he qualifies as a treating physician.

Once accorded treating physician status, Dr. Blackburn's opinion is entitled to controlling weight. *See Blakley*, 581 F.3d at 406. To assign anything less requires the ALJ to specifically determine and state the amount of weight given to the opinion, based on the factors iterated in *Blakley*, originally set forth in 20 C.F.R. § 404.1527(d)(2): (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, and (5) any specialization of the treating physician.

ALJ Miller completely discounted the opinion of Dr. Blackburn, stating the doctor's assessment of Plaintiff's residual functional capacity could only be given "very little weight as it is

21

based on the claimant's subjective complaints" (Docket No. 10, p. 24 of 429). The ALJ failed to conduct the balancing of factors to determine *why* he was according Dr. Blackburn's opinion so little weight. ALJ Miller provided a rather limited review of only some of Plaintiff's more recent medical records which vaguely hint at an opinion contrary to that of Dr. Blackburn (Docket No. 10, pp. 23-25 of 429). This accounting does not come close to the type of analysis required to properly discount the opinions of a claimant's treating physicians. The ALJ fails to mention Plaintiff's rather lengthy history with Dr. Blackburn, the number of times Plaintiff was seen by Dr. Blackburn, the nature and extent of the doctor/patient relationship, or the supportability and consistency of Dr. Blackburn's opinion with the record as a whole (Docket No. 10, p. 24 of 429).

The ALJ also failed to iterate "good reasons" for his decision to deny Dr. Blackburn's opinion controlling weight. As stated previously, an ALJ must give good reasons in his notice of determination or decision for the weight he gives a claimant's treating physician. *Blakley*, 581 F.3d at 407; *see also* 20 C.F.R. § 404.1527(c)(2). These good reasons "must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley*, 581 F.3d at 407 (*quoting SSR* 96-2p, 1996 SSR LEXIS 9 at *12) (internal quotations omitted)). ALJ Miller's review of some of Plaintiff's medical records, although it contains some opinions contrary to those of Dr. Blackburn (Docket No. 10, pp. 23-25 of 429), is not sufficient to satisfy this "good reasons" requirement.

It is a fundamental principle of administrative law that an agency is bound to follow its own regulations. *Wilson*, 378 F.3d at 545. "An agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate notice and consequently may result in a violation of an

individual's constitutional right to due process." *Id.* (*citing Sameena, Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) (internal citations omitted)). Courts have remanded the decision of the Commissioner when it has failed to articulate "good reasons" for not crediting the opinion of a claimant's treating physician. *Wilson*, 378 F.3d at 545.

Based on the ALJ's failure to abide by the requirements of the treating physician rule, this Magistrate must remand this case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

### 2.    IMPROPER HYPOTHETICAL

In Plaintiff's second assignment of error, he alleges the ALJ erred in relying on the testimony of the VE because the testimony: (1) was based on an inaccurate hypothetical in that it minimized or ignored Plaintiff's past job as it was *actually* performed; and (2) directly conflicts with the definitions provided in the DOT (Docket No. 14, p. 13 of 17). According to Defendant, these arguments are unavailing (Docket No. 15, pp. 5-10 of 10).

Step four of the sequential evaluation process requires the ALJ to determine whether a claimant has the residual functional capacity to perform his past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920 (e). Past work is generally considered "relevant" when it was performed within the last fifteen years, lasted long enough for an individual to learn it, and was substantial gainful activity. 20 C.F.R. §§ 404.1565(2), 416.965(a). The relevant inquiry is whether the claimant can return to his past *type* of work, not just his past specific job. *See Studaway v. Sec'y of Health & Human Servs.*, 815 F.2d 1074, 1076 (6th Cir. 1987).

To satisfy this requirement, the ALJ may call a VE to offer expert testimony. In the Sixth Circuit, a VE's testimony must be based on a hypothetical question which accurately portrays the

23

claimant's physical and mental impairments. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). This evidence may only be used as substantial evidence of a claimant's residual functional capacity when that testimony is in response to a hypothetical question that "accurately portrays [the claimant's] individual physical and mental impairments." *Davis v. Sec'y of Health & Human Servs.*, 915 F.2d 186, 189 (6th Cir. 1990). However, it is also "well established that an ALJ . . . is required to incorporate only those limitations accepted as credible by the finder of fact" into the hypothetical question. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

> The ALJ posed the following hypothetical to the VE:
>
> Please consider a hypothetical individual of the Claimant's age, education and work experience and the residual functional capacity to perform the functional range of sedentary work that involves occasional overhead reaching; no climbing of ramps or stairs; no ladders, ropes or scaffolds; avoid temperature extremes and unprotected heights. With these limitations, would there be any jobs . . . in . . . the Claimant's past work?

(Docket No. 10, p. 66 of 429). Plaintiff alleges the ALJ's hypothetical was incomplete, as it failed to account for Plaintiff's need for a sit/stand option, the ability change positions frequently, and the limitation of only occasional twisting (Docket No. 14, pp. 11-12 of 17). According to Plaintiff, Dr. Blackburn incorporated all of these additional limitations into his evaluation of Plaintiff's residual functional capacity (Docket No. 14, p. 12 of 17). Plaintiff is correct in his assessment that ALJ Miller's hypothetical does not mirror Dr. Blackburn's opinion exactly (Docket No. 10, pp. 367-70 of 429). But as stated previously, the law only requires an ALJ to incorporate into the hypothetical "those limitations accepted as credible." *Casey*, 987 F.2d at 1235. ALJ Miller did not find Dr. Blackburn's opinion to be reliable, based on the objective medical evidence contained in the record (Docket No. 10, p. 24 of 429). As such, the ALJ was not required to incorporate Dr. Blackburn's opinion in its entirety,

24

if at all, into the hypothetical posed to the VE.

Furthermore, Plaintiff fails to mention that his own attorney added Dr. Blackburn's sit/stand

limitation to the ALJ's original hypothetical:

> ATTY:    Mr. Pinti, if we add to the Judge's hypothetical he's already given you,
> that . . . our hypothetical individual can only stand four out of the eight
> hours in a course of a shift, would that change your answer that you've just
> given to the Judge?
>
> VE:      It would change it . . . if the employer would . . . not allow the person to sit,
> even though they could [do] the job sitting, yes.

(Docket No. 10, p. 73 of 429).

Plaintiff also alleges the ALJ erred in relying on the VE's testimony because that testimony

minimized or ignored Plaintiff's past job as it was *actually* performed (Docket No. 14, p. 13 of 17).

Under 20 C.F.R. § 404.1560(b)(1), "a vocational expert . . . may offer relevant evidence within his or

her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant

work, *either as the claimant actually performed it or as generally performed in the national economy*"

(emphasis added).

In Plaintiff's case, the VE explored certain differences in Plaintiff's past work as he performed

it and as it was generally performed, noting that the largest difference was Plaintiff's inability to sit at

his last job (Docket No. 10, pp. 75-76 of 429). The VE testified that this job was one that was normally

done sitting down, as most employers would not "force [employees] to stand for no apparent reason"

(Docket No. 10, p. 74 of 429). As such, Plaintiff's need for a sit/stand option would not prevent him

from performing his past relevant work as it is *normally* performed in the national economy.

Additionally, the VE specifically agreed with the ALJ when, in response to counsel's addition to the

original hypothetical, the ALJ stated, "the past relevant work could be performed as normally

25

performed but, perhaps, maybe not as the Claimant performed it" (Docket No. 10, p. 74 of 429). Therefore, Plaintiff's claim of error is without merit.


       **3.**      **DICTIONARY OF OCCUPATIONAL TITLES**

Plaintiff also alleges the ALJ erred in relying on the VE's testimony because that testimony was in direct conflict with the DOT and the Selected Characteristics of Occupations ("SCO") (Docket No. 14, p. 13 of 17).

The Social Security Administration recognizes that, on occasion, the testimony of a VE may conflict with the information set forth in the DOT. *See Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 603 (6th Cir. 2009). In order to resolve this potential situation, "the Social Security Administration has imposed an affirmative duty on ALJs to ask the VE if the evidence that he or she has provided conflicts with [the] information provided in the DOT. *Id.* (*citing SSR* 00-4p, 2000 SSR LEXIS 8 at *9 (Dec. 4, 2000) (internal quotations omitted)). An ALJ must "obtain a reasonable explanation for . . . apparent conflict[s] if the VE's evidence appears to conflict with the DOT. *Id.* (internal quotations omitted). Once an ALJ has either received confirmation that the VE's testimony corresponds to the information in the DOT *or* obtains a reasonable explanation as to why it does not, the ALJ is under no affirmative duty to "conduct an independent investigation into the testimony of witnesses to determine if they are correct." *Lindsley*, 560 F.3d at 606 (*quoting Martin v. Comm'r of Soc. Sec.*, 170 F.App'x 369, 374 (6th Cir. 2006)).

As evidenced by the record, ALJ Miller followed the required procedure. ALJ Miller first advised the VE that if he were to give an opinion inconsistent with the information contained in the DOT, the VE was obligated to advise the ALJ of the conflict and the basis for his opinion (Docket No.

26

10, pp. 42-43 of 429). The VE then testified that, under DOT classifications, Plaintiff's past work constituted that of a numerical control machine operator, DOT number 007.167-018, a sedentary position (Docket No. 10, pp. 43-44 of 429). The VE did not indicate any discrepancy between his classification of Plaintiff's former work and the description of that work contained in the DOT (Docket No. 10, p. 44 of 429). Therefore, ALJ Miller followed the proper procedure with regard to the VE's expert testimony and classification of Plaintiff's previous work.

It should be noted that, despite being given the distinct opportunity, Plaintiff's counsel failed to investigate any believed conflict between the VE's testimony and the DOT (Docket No. 10, p. 44 of 429). In fact, Plaintiff's counsel *declined* the opportunity to cross-examine the VE with regard to his classification of Plaintiff's past work (Docket No. 10, p. 44 of 429). Given Plaintiff's acceptance of the VE's testimony and classification at the time of the hearing, Plaintiff cannot now complain of error.

Plaintiff's second claim of error is therefore without merit and the ALJ's opinion regarding Plaintiff's residual functional capacity and his ability to perform his past relevant work is affirmed.

### VIII. CONCLUSION

For the foregoing reasons, this Magistrate remands this case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) to properly provide good reasons for discounting the opinion of Plaintiff's treating physician, Dr. Blackburn, and for further proceedings consistent with this opinion.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   October 15, 2012